UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KENNETH FITZGERALD NIXON,

        Petitioner,

                               CASE NO. 2:10-CV-14652

    v.                             JUDGE AVERN COHN

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

GREG McQUIGGIN,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    *Newly Discovered Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    E.    *Prosecutorial Misconduct (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            1.    *Perjured Testimony (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                    a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
                    b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            2.    *Questioning of Witnesses and Comments (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . 19
                    a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                    b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    F.    *Ineffective Assistance of Counsel (Claims II & V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            2.    *Trial Counsel (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                    a. Failure to Investigate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                    b. Improper Advice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                    c. Failure to Present Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                    d. Failure to Object . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
            3.    *Appellate Counsel (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    G.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . 34
            1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
            2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    H.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Kenneth Fitzgerald Nixon is a state prisoner, currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan.

2.      On September 21, 2005, petitioner was convicted of two counts of first degree felony murder, MICH. COMP. LAWS § 750.316(1)(b); four counts of attempted murder, MICH. COMP. LAWS § 750.91; and arson of a dwelling, MICH. COMP. LAWS § 750.72, following a jury trial in the Wayne County Circuit Court.  On October 12, 2005, he was sentenced to mandatory terms of life imprisonment without parole on the murder convictions, concurrent terms of 20-40 years' imprisonment on the attempted murder convictions, and a concurrent term of 10-20 years' imprisonment on the arson conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON A SWORN AFFIDAVIT SIGNED BY HIS CO-DEFENDANT LATOYA CAULFORD, WHO STATES THAT MR. NIXON DID NOT COMMIT THE CRIMES FOR WHICH HE WAS CONVICTED DUE TO THE FACT THAT HE WAS WITH HER DURING THE ENTIRE TIME PERIOD WHEN THE CRIME WAS ALLEGED TO HAVE TAKEN PLACE.

II.     THE COURT ABUSED ITS DISCRETION WHEN IT ADMITTED EVIDENCE OF DEFENDANT'S JAIL INCARCERATION THROUGH AUDIO CLIPS OF HIS JAIL CALLS WHEN THAT EVIDENCE WAS MARGINALLY PROBATIVE, HIGHLY PREJUDICIAL, AND THERE WAS A DANGER THE JURY WOULD GIVE IT UNDUE WEIGHT.

III.    DEFENDANT WAS DENIED DUE PROCESS WHEN THE COURT

2

ERRONEOUSLY ALLOWED BRANDON VAUGHN'S STATEMENT OF IDENTIFICATION INTO EVIDENCE UNDER THE EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE.

IV.   DEFENSE TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN: (1) FAILING TO OBJECT TO THE TESTIMONY OF BRANDON VAUGHN'S STATEMENT OF IDENTIFICATION INTO EVIDENCE UNDER THE EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE; AND (2) FAILING TO OBJECT AT TRIAL TO IRRELEVANT EVIDENCE THAT DEFENDANT, DEFENDANT'S FAMILY OR OTHERS ALLEGEDLY THREATENED OR ATTEMPTED TO BUY-OFF A WITNESS, WHERE THERE WAS NO PROOF THAT APPELLANT HAD ANYTHING TO DO WITH THOSE THREATS OR ALLEGED PAY-OFF OFFER.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Nixon*, No. 266033, 2007 WL 624704 (Mich. Ct. App. Mar. 1, 2007) (per curiam).

4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Nixon*, 480 Mich. 854, 737 N.W.2d 743 (2007).

5.     Petitioner thereafter filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising claims of newly discovered evidence, ineffective assistance of counsel, and prosecutorial misconduct. The trial court denied the motion on July 17, 2009. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Nixon*, 488 Mich. 852, 787 N.W.2d 482 (2010); *People v. Nixon*, No. 293476 (Mich. Ct. App. Nov. 23, 2009).

6.     Petitioner, through counsel, filed the instant application for a writ of habeas corpus on November 23, 2010. As grounds for the writ of habeas corpus, he raises the following claims:

I.   PETITIONER SHOULD BE EXCUSED FROM PROCEDURAL

3

DEFAULTS, IF ANY, BECAUSE OF A SUBSTANTIAL SHOWING OF INNOCENCE.

II.     PETITIONER WAS DENIED A FAIR TRIAL BY INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT.

III.    PROSECUTOR'S USE OF PERJURED TESTIMONY DENIED PETITIONER DUE PROCESS.

IV.     THE PROSECUTOR PREJUDICED PETITIONER WITH IMPROPER AND MISLEADING ARGUMENT.

V.      FAILURE TO PROVIDE CONSTITUTIONALLY EFFECTIVE REPRESENTATION ON APPEAL.

7.      Respondent filed his answer on June 3, 2011.  He contends that petitioner's claims are without merit.

8.      Petitioner filed a reply to respondent's answer on July 18, 2011.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the firebombing of a home in which Naomi Vaughn lived with her boyfriend and five children.  As a result of the firebombing, two of the children in the home were killed.  The evidence adduced at trial was summarized in the prosecutor's brief on appeal:

> This case arises out of the firebombing of Naomi Vaughn's home on May 19, 2005.  Her ten-year-old son Raylond and one-year-old daughter Tamyah died in the fire. 9/19/05, 76-77. Also living at the home were Vaughn's three other children and her boyfriend, Ronrico Simmons. 9/14/05, 62-65; 9/15/05, 68-69.
>
> Simmons had dated and had a sexual relationship with codefendant LaToya Caulford during the first two months of 2005. Caulford lived approximately three blocks away from Vaughn. Defendant Kenneth "Beans" Nixon and Caulford had a child together. Although Simmons believed that defendant and codefendant were no longer together, he learned otherwise in February. Defendant told Simmons that "he didn't want to be walking around and everybody think he a hoe." He said "it wasn't over until somebody was dead." 9/15/05, 68-71, 102-103.
>
> In March, Simmons and defendant had a confrontation, and Simmons broke out the windows of defendant's car. Two days later, they had a phone conversation. 9/15/05, 71-73. Simmons had no conversations or dealings with defendant after the

4

month of March. 9/15/05, 87-88. He saw defendant twice in front of Caulford's house, but did not stop. 9/15/05,73-74.

On the night of the fire, Naomi Vaughn's thirteen-year-old son Brandon was in his bedroom when he heard a "boom." He ran downstairs, unlocked the door, and saw defendant getting into the passenger seat of codefendant's green Neon. Brandon chased after the car as it backed up and saw that codefendant was driving. He then ran back to the house. He quickly realized that the house was on fire, and woke up his mother. He led her outside, and then returned to retrieve one of his sisters. He was unable to go upstairs because the fire was too strong. 9/15/05, 181-193, 224.

Naomi Vaughn awoke to Brandon's screams of "Ma, ma." On stepping out of her room, she felt the heat of the fire. She saw Raylond's bed on fire, and tried to grab him, but the fire exploded. She ran down the stairs but intended on trying to save Raylond again. Brandon then unlocked the door, and she, Brandon and one of her daughters ran outside. While outside, she asked Brandon about Tamyah. They then ran back into the house, but could not find her in her room. At that point, Brandon was screaming "Beans and Toya did this to us." Brandon retrieved his sister Alicia and they exited the house. He and his mother attempted to enter the house once more, but the fire was too strong. 9/14/05, 65-69.

Brandon talked to Simmons after he exited the house for the second time. 9/15/05, 227-229. Simmons had gone to a coffee shop on the night of the fire. On returning, he saw that the house was on fire. 9/15/05 73-76. He unsuccessfully attempted to get the children out of the house before calling 911. 9/15/05, 76, 110-111. He later spoke with Brandon. Brandon was "frantic" and crying. [Brandon told Simmons] that he saw Beans pull up in a green Neon, throw a cocktail at the house, jump back in the car, and back up down the street. He said Toya was driving the car. 9/15/05, 79-80.

Firefighters responded to the scene and discovered the second story of the home engulfed in flames. 9/14/05, 164-165, 169-172. The arson investigator, Lt. Frank Maiorana, spoke to Brandon at the crime scene. Brandon told him that he heard a loud boom, that the room erupted in flames, and that smoked filled the second floor of the house. He said that he ran out of the house and saw a person run from the front of the house and get in the passenger side of a car. The car backed up down the street, turned around, and drove away. Lt. Maiorana's notes reflected that Brandon named the person as "Bing," but Lt. Maiorana conceded that he may have misunderstood him. Brandon also told him that the car belonged to Bing's baby's momma. 9/l5/05, 153-154.

Officer Kurtiss Staples likewise interviewed Brandon at the scene. Brandon told him that he was standing on the front porch when he saw a car pull up in front of the house. He saw Bean get out of the passenger side of the car. He was holding a glass bottle with a cloth sticking out of the top. He threw the bottle at the house through the top window. Brandon indicated that he had seen Bean's baby momma driving the car earlier in the day. The car went in reverse after the fire and then turned around. 9/19/05, 90-96.

The handler of Swifty, a dog trained to detect flammable liquids, arrived on

the scene after the tire had been put out. The dog alerted him to the second floor south bedroom, just below the window that faced the street. The handler smelled gasoline. 9/l4/05, 175-179. Lt. Maiorana likewise smelled the odor of gasoline when he examined the house. He opined that the fire started at the second-floor window and extended to the bed. He found the remains of a green bottle on the floor under the window, and opined that the Molotov cocktail landed on the person who was in the bed. 9/l5/05, 142-146, 151, 164. Subsequent testing of the glass revealed the presence of a "gasoline/heavy mix," such as kerosene or a charcoal starter. 9/l9/05, 73.

The police executed a search warrant at 19380 Havana at approximately 3:00 a.m. on the night of the fire. They arrested defendant in the home. 9/l5/05, 56-58. Size 12 gym shoes, pants, and a green belt were found in the home. Swifty later alerted its handler to those items. 9/14/05, 137-139, 179-182. During a telephone call made from the jail on June 15, 2005 defendant stated that the dog searched his clothes. [People's Exhibit 33]. 9/19/05, 71-72, 166. Those clothes tested positive for the presence of gasoline. 9/19/05, 73.

A green Neon was parked in the street in front of the Havana St. house. A tow truck was also parked on the street. 9/14/05,139-141; 9/19/05, 80-81. After the police impounded the car, Swifty alerted its handler to right corner of the front passenger seat, the floorboard area below that seat, and some clothing in the rear seat. 9/14/05, 182-185. An evidence technician took samples of cloth and carpet from the front passenger seat, clothing from the rear passenger seat, and gloves and a pair of size 12 boots from the trunk, but subsequent testing did not reveal any petroleum products. 9/14/05, 147-151, 163-164; 9/19/05, 74. Codefendant's fingerprint was found on the rearview mirror. 9/14/05, 151-152, 163. From the tow truck, the technician retrieved a white T-shirt and a red plastic gas can. 9/14/05,152-154.

Defendant was arraigned on the warrant on May 22, 2005 [See Circuit Court Docket Entries]. Both he and Stanley January were housed together in quarantine at the jail the following day. [Mr. January did not receive any consideration for his testimony in the instant case. As part of his plea agreement, he agreed to testify in another case. 9/19, 15-18, 29, 48-52; People's Exhibit 29, attached as Appendix B]. 9/19/05, 60-62. They and other inmates spoke about their respective cases. 9/19/05, 18-20. That day, defendant also arranged for a three-way call so that January could speak to his daughter. 9/19/05, 20-21, 52-55. A recording of that call corroborated January's testimony. [People's Exhibit 30] 9/19/05, 27-28.

January testified that defendant spoke about the firebombing and said something about a cocktail. Defendant said he was sorry about the kids because he just had a kid himself. He thought Naomi was home when he committed the firebombing, not the kids. 9/19/05, 21, 24, 26.

January only had contact with defendant on May 23, 2005, because defendant was moved to a different cell later in the day. 9/19/05, 29. A recording of a call defendant made from the jail at 11:00 a.m. on May 24, 2005, corroborated January's testimony in that regard. In that call, defendant acknowledged that he had been moved in the jail. [People's Exhibit 32]. 9/19/05, 71.

On June 10, 2005, the date defendant was arraigned on the Information in Circuit Court, defendant made a telephone call from the jail. During that call, defendant (1) discussed Mario, Lisa, and Mario's "daddy," (2) stated that they "don't want Mario," and (3) referring to Mario's daddy, said "don't offer him nothing" because he would "tell." [People's Exhibit 34]. 9/19/05, 72, 167-168.

In September of 2005, the Court presided over defendant's trial during which defendant was represented by attorney Robert F. Kinney III. Mario Mahdi was one of the People's witnesses. Mahdi testified that defendant was "hurt" by Simmons dating codefendant. In April, defendant stated to him "How would you feel if your friend was messing with your girl?" 9/15/05, 20. Mahdi, however, testified that he had lied to the police when he told them that defendant said "he's going to get his" as they passed by Simmons home in March or April 9/15/05,16-19.

Mahdi testified that defendant was at the house on Havana when he arrived home with his girlfriend at 10:50 p.m. on the night of the fire. He said his mother, codefendant, and codefendant's child were on the couch and defendant was in the shower. He said defendant must have gotten out of the shower and gone into the bedroom at 11:15 or 11:20. 9/15/05, 29-31, 37-40. He said he saw defendant playing video games downstairs at some point. He went upstairs to bed at about 1:00. When he came back downstairs at about 1:30 to get a condom, he saw defendant in bed next to codefendant. 9/15/05, 40-42. He said he had told the police that he saw defendant's face twice that night, but the police did not record what he told them regarding where he saw defendant. 9/15/05, 50-51.

In addition to Officer Staples, defense counsel called three witnesses. Trevor Hill testified that he worked with defendant driving tow trucks. He said that they worked together on May 19, 2005, and he last saw him that night at 7:00 or 7:30 p.m. Hill testified that defendant called him a couple of times that evening, and they last spoke at between 9:00 and 10:00. Defendant called him to tell him that he had locked the shop and then called him again after he arrived home. 9/19/05, 109-116.

Codefendant's next-door neighbor, Basim Alyais, testified that he saw defendant outside codefendant's house at approximately 4:00 p.m. on May 19, 2005. Defendant was holding his baby and waiting for codefendant. Codefendant arrived at between 4:30 and 5:00. Defendant went inside with codefendant, but eventually left in codefendant's car. He returned at between 9:30 and 10:00 p.m. 9/19/05, 128-131, 137. Alyais testified that he sat on his porch, drinking beer, until 12:00 or 12:30 a.m. He did not see defendant leave again. Both codefendant's car and the tow truck were still there when he went inside his house. 9/19/05, 131-132.

Codefendant's aunt, Lisa Anne Caulford-Zaatari, testified that she arrived at codefendant's home on May 19, 2005, at 4:00 or 5:00 p.m. Codefendant came home about fifteen minutes later. At 5:15 or 5:30 p.m., she and codefendant left. When they returned at 6:00 or 6:30 p.m., defendant was waiting in the tow truck with the baby. Defendant left thirty or forty-five minutes later in the Neon. 9/19/05, 140-142, 145-148. He was wearing dirty work clothes when he returned at between 8:30 and 9:30. According to Caulford-Zaatari, defendant talked on his cell phone and played with the baby. At about 9:30 or 9:45, he took a shower. He, codefendant, and the

7

baby then went into the bedroom. 9/19/05, 142-143. She testified that defendant never left the house again that night. The car did not leave either. When Caulford-Zaatari left at 12:10 a.m. to go to Majid's house, defendant, codefendant, the baby, and Mario were at the house. 9/19/05, 143-144, 149-151.

Caulford-Zaatari testified that defendant, codefendant, and the Neon did not leave after defendant arrived home that night. She explained: "Because I would have seen, if he was going to take the green Neon or if Toya was going to take the green Neon, they would have left, they would have had to get out of the bedroom through me." She testified that defendant and codefendant were in the bedroom the entire time. 9/19/05, 150-151.

Pl.-Appellee's Br. on App., in *People v. Nixon*, No. 293476 (Mich. Ct. App.), at 3-10; *see also*, Def.-Appellant's Br. on App., at 1-4; Pet'r's Br. in Supp. of Pet., at 2-6.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the

benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.   *Newly Discovered Evidence (Claim I)*

Petitioner contends that newly discovered evidence establishes that he is actually innocent of the crimes for which he was convicted. For the most part, petitioner asserts this claim as a basis for overcoming any procedural bars, rather than as an independent basis for relief. Respondent asserts a procedural bar with respect to petitioner's prosecutorial misconduct claims, but argues alternatively that these claims are without merit. Further, as explained below these claims are meritless and thus the Court need not rely on a procedural bar in resolving the petition.[1]

To the extent petitioner is attempting to assert an freestanding innocence claim, he is not

---

[1]While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Thus, while the procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also*, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995). Accordingly, the Court may proceed directly to the merits of the purportedly defaulted claims.

entitled to habeas relief.  First, such a claim is not cognizable on habeas review.  A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, the existence of new evidence, standing alone, is not a basis for granting the writ.  As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id*. at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).  Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief.  *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007); *Wright v. Stegall*, 247 Fed. Appx. 709, 711 (6th Cir. 2007).[2]

---

[2]In *Herrera* and again in *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court noted that it might be the case that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief," but explicitly declined to determine whether this is, in fact, the constitutional rule.  *Herrera*, 506 U.S. at 417; *see also*, *House*, 547 U.S. at 555.  This rule affords no basis for relief to petitioner, however.  First, as *Herrera* makes clear this rule is limited to the context of executing an innocent person, and has no applicability in a non-capital case.  *See Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010); *Wright*, 247 Fed. Appx. at 711.  Second, because the Supreme Court has recognized that the question whether there

Further, even if such a claim were cognizable, petitioner's evidence falls far short of that necessary to establish that he is innocent. In *Herrera*, without elaborating further, the Court noted that even if a free-standing claim of innocence were cognizable on habeas review, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. In *Schlup*, the Court elaborated on the showing required to establish "actual innocence" for purposes of overcoming a procedural bar to consideration of a constitutional claim. The Court explained that, to establish actual innocence, the petitioner must "show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted). The Supreme Court has also explained that a petitioner cannot establish his actual innocence merely be rehashing his innocence claims raised in the state courts and relying on the evidence adduced at trial. If he could, federal habeas review would become nothing more than a second trial on the merits, something the Supreme Court has repeatedly admonished the federal courts to avoid. *See Milton v. Wainwright*, 407 U.S. 371, 377 (1972) ("The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo*[.]"). Thus, "to be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional

---

exists a "federal constitutional right to be released upon proof of 'actual innocence' . . . is an open question," *District Attorney's Office for the 3d Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2321 (2009), a state court's failure to grant relief on the basis of actual innocence cannot be contrary to or an unreasonable application of any clearly established federal law under § 2254(d)(1). *See Reyes v. Marshall*, No. CV 10-3931, 2010 WL 6529336, at *3 (Aug. 23, 2010), *magistrate judge's report adopted*, 2011 WL 1496376 (C.D. Cal. Apr. 14, 2011). *See generally*, *Murdoch v. Castro*, 609 F.3d 983, 994 (9th Cir. 2010) (state court's failure to grant relief on basis which Supreme Court has recognized is an open question cannot be unreasonable application of clearly established law); *Smith v. Hofbauer*, 312 F.3d 809, 817 (6th Cir. 2002) (same).

error with new reliable evidence that was not presented at trial." *Schlup*, 513 U.S. at 324.

"Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence").

Here, petitioner's innocence claim is not based on the type of new, reliable evidence identified in *Schlup*. Petitioner relies primarily on the unsigned, unnotarized affidavit of Chris Crump. *See* Br. in Supp. of Pet., App. 13. In this affidavit, Crump avers that while incarcerated with January, January told Crump that he had found a way to "get out from under his case." January told Crump that

> a guy that was housed in the same unit with him had went to recreation, and while he was out of his cell he went through his discovery package and read his police incident report and found out the details of why the guy was accused of a murder. He said that he (Stanley January) was going to make up a lie that involved the circumstances of what he was charged with to try and make a deal with the prosecutor to get his case dropped or try and get the minimum amount of time for his in exchange for testifying against this guy.

*Id.*, ¶ 5. Crump's affidavit is not the type of new, reliable evidence identified in *Schlup* for a number of reasons. First, Crump has never signed the affidavit. "[A]n unsigned, undated, and unnotarized affidavit by a fellow-prisoner stating that one of the Government witnesses lied at the trial" is insufficient to warrant habeas relief or an evidentiary hearing. *Purkhiser v. Wainwright*, 455 F.2d 506, 507 (5th Cir. 1972) (per curiam); *see also*, *Teahan v. Almager*, 383 Fed. Appx. 615, 615 (9th Cir. 2010) (unsworn statements of purported alibi witnesses given to counsel were insufficient to show actual innocence); *Milton v. Secretary, Dep't of Corrections*, 347 Fed. Appx. 528, 531 (11th Cir. 2009) ("The alleged 'Oath Statement' of the victim's mother is not new, reliable evidence

13

because it is not sworn to or signed by the purported author.").  Second, new statements from witnesses years after the crime are inherently suspect, *see Schlup*, 513 U.S. at 331, and such statements are to be viewed with "a degree of skepticism."  *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see also*,  *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (citing *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001).  Third, even if Crump would have testified to the facts stated in his purported affidavit, the testimony regarding January's statements to him would have been hearsay, and thus inadmissible as substantive evidence.  At most, they would have been admissible solely to impeach January's testimony.  Such newly discovered impeachment evidence does not provide sufficient evidence of actual innocence to overcome a procedural bar, much less does it provide sufficient evidence to support a free-standing innocence claim.  *See Calderon v. Thompson*, 523 U.S. 538, 563 (1998) (newly discovered impeachment evidence, which is "a step removed from evidence pertaining to the crime itself," "provides no basis for finding" actual innocence); *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) (newly discovered impeachment evidence "will seldom, if ever," establish actual innocence).

Petitioner also relies on the results of independent polygraph examinations taken by him and his codefendant.  These results do not constitute reliable evidence of innocence to satisfy a *Schlup* gateway claim, much less the significantly higher bar applicable to any freestanding claim of innocence.  Because polygraph results are "generally inadmissible as unreliable," they are "not persuasive evidence of actual innocence." *Knickerbocker v. Wolfenbarger*, 212 Fed. Appx. 426, 433 (6th Cir. 2007); *see also*, *Pearson v. Booker*, No. 08-14422, 2011 WL 3511484, at *8 (E.D. Mich. Aug. 11, 2011) (Lawson, J.); *Bower v. Walsh*, 703 F. Supp. 2d 204, 208 (E.D.N.Y. 2010).  Accordingly, the Court should conclude that to the extent petitioner is attempting to raise a

14

freestanding claim of innocence as a substantive ground for relief, it is not cognizable and without merit.[3]

E.   *Prosecutorial Misconduct (Claims III & IV)*

Petitioner raises two separate prosecutorial misconduct claims. First, in Claim III, petitioner contends that the prosecutor presented perjured testimony. Second, in Claim IV, petitioner contends that he was denied a fair trial by the prosecutor's questions to a witness and comments. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.   *Perjured Testimony (Claim III)*

Petitioner first argues that the prosecutor presented the perjured testimony of January, the jailhouse informant. The Court should reject this claim.

a. *Clearly Established Law*

---

[3]In his reply, petitioner contends that the trial court, in rejecting petitioner's new evidence claim, concluded that Crump's affidavit was unreliable because only scientific evidence can support a finding of innocence sufficient to grant a new trial. Petitioner contends that this statement by the trial judge is contrary to, or an unreasonable application of, clearly established federal law, namely *Schlup* and *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). There are a number of problems with this argument. First, *Souter*, being a court of appeals case, cannot constitute "clearly established Federal law, as determined by the Supreme Court," under § 2254(d)(1). Second, neither *Schlup* nor *Souter* establish a federal constitutional standard for evaluating newly discovered evidence applicable to the states. They merely discuss the federal standard for evaluating newly discovered evidence to overcome a procedural bar. On the contrary, it is well established that nothing in the Constitution requires a state to establish a system of postconviction review, and thus "an infirmity in a state post-conviction proceeding does not raise a constitutional issue[.]" *Gee v. Groose*, 110 F.3d 1346, 1351-52 (8th Cir. 1997) (internal quotation omitted); *accord Murray v. Giarratano*, 492 U.S. 1, 13 (1989) (O'Connor, J., concurring); *Dawson v. Snyder*, 988 F. Supp. 783, 826 (D. Del. 1997) (citing *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) and *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992)). Finally, as characterized by petitioner (the transcript has not been submitted to the Court), the judge stated at the hearing that the evidence "was 'unscientific' and not likely to lead to a different result." Reply, at 2 (quoting Hr'g Tr., dated 7/17/09, at 32-33). This statement is a far cry from a legal conclusion that only scientific evidence can justify a new trial, and in any event does not appear far off from the *Schlup* Court's recognition that "reliable evidence" consists of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324.

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, *see Napue*, 360 U.S. at 270, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected, *see id.* at 269. To succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew of the falsity; and (3) the evidence was material. *See Coe v. Bell*, 161 F.3d 320, 343

With respect to the first element, it is well established that petitioner bears the burden of proving that the testimony amounted to perjury. As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."); *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976). (6th Cir. 1999). As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*, 983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to

16

establish *Napue* violation defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'").   In other words, petitioner must show that the testimony was "indisputably false."   *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

With respect to the second element, as the Sixth Circuit has explained in order for a witness's perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury."   *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975).  The Sixth Circuit has repeatedly reaffirmed the requirement that a petitioner show prosecutorial involvement in or knowledge of the perjury.   *See, e.g.*, *Rosencrantz v. Lafler*, 568 F.3d 583-84 (6th Cir. 2009); *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000); *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *Ford v. United States*, No. 94-3469, 1994 WL 521119, at *2 (6th Cir. Sept. 23, 1994); *Akbar v. Jago*, No. 84-3540, 1985 WL 13195, at *1 (6th Cir. Apr. 10, 1985); *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975).  And the Supreme Court has repeatedly characterized the Due Process Clause only as barring conviction on the basis of perjury known by the prosecution to be such.   *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (emphasis added) ("[I]t is established that a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added) (due process is violated by the "*knowing* use of perjured testimony."); *see id*. at 103-04 & nn. 8-9 (discussing cases).   At a minimum, "[t]he Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecution did not know of the testimony's falsity at trial."

17

*LaMothe v. Cademartori*, No. C 04-3395, 2005 WL 3095884, at *5 (N.D. Cal. Nov. 11, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to consider the question of whether due process is violated by a conviction based on perjured testimony regardless of the prosecutor's knowledge)); *cf. Briscoe v. LaHue*, 460 U.S. 325, 326 n. 1 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights.").

### b.  Analysis

Here, petitioner can show neither that January's testimony amounted to perjury nor that the prosecutor knew of any such perjury.  As to the first element, petitioner's claim is based on Crump's affidavit.  As explained above, however, this unsigned affidavit has no evidentiary weight.  In the absence of any proper evidence that January committed perjury, petitioner's claim fails.  More fundamentally, even assuming that petitioner could show that January's testimony was false, he has presented no evidence that the prosecutor had any knowledge of or involvement in the perjury. Petitioner does not assert that the prosecutor had any specific knowledge of January's alleged perjury.  Rather, petitioner merely argues that "[t]he prosecutor, in general, is aware of the strong possibility of false testimony as provided by a jail house informant" and that a prosecutor therefore "misleads and suborns perjury when vouching for and telling a jury they should exclusively rely upon jailhouse informant testimony to convict."  Br. in Supp. of Pet., at 33.  Petitioner cites no caselaw holding that such general knowledge about the unreliability of jailhouse informer testimony constitutes knowledge that a specific witness committed perjury.  On the contrary, petitioner's general claim regarding the reliability of such testimony "does not . . . demonstrate that prosecutors

in [petitioner's] particular case knew that [January was] lying." *Dykes v. Borg*, No. 94-55111, 1995 WL 139360, at *1 (9th Cir. Mar. 30, 1995). Petitioner further argues that "it is reasonably inferred that either the investigating officers and/or the prosecutor knew Stanley January was lying to the jury" because the prosecutor knew that: (1) January was taking notes on various inmates trying to piece together facts about their cases for the purpose of offering testimony against them; (2) January had already testified against another inmate; and (3) January waited 3 months to tell anyone about petitioner's statement to him. These facts were all brought out during the questioning of January, and certainly provide bases upon which to discount January's testimony. They do not, however, show that the prosecutor knew that January was committing perjury. Speculative allegations of prosecutorial knowledge are insufficient to establish a *Napue/Giglio* claim. *See Skains v. California*, 386 Fed. Appx. 620, 621-22 (9th Cir. 2010). Because petitioner has failed to establish either that January's testimony was false or that, if false, the prosecutor knew of the falsity, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

    2.    *Questioning of Witnesses and Comments (Claim IV)*

In his fourth claim, petitioner contends that he was denied a fair trial by the prosecutor's questioning of witnesses and comments during closing argument. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation

omitted).  *Darden* constitutes "[t]he 'clearly established Federal law' relevant" to a prosecutorial misconduct claim.  *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case-determinations.'"  *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In reviewing whether prosecutorial comments deprived a defendant of a fair trial, a court may not consider the remarks in isolation, but must consider the remarks in the context of the entire trial, including the prosecutor's appropriate comments, the court's instructions to the jury, and the evidence presented in the case.  *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974).  Even on direct review, where AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."  *Young*, 470 U.S. at 11.

*b.  Analysis*

Petitioner contends that the prosecutor deprived him of a fair trial by asking Trevor Hill, petitioner's employer, whether he had threatened any witness outside the courthouse.  The prosecutor asked Hill:

Q.    Okay.  Sir, have you threatened any of the People's witnesses in this case?
A.    No.  I don't even know who the witnesses are.
Q.    You don't even know who the witnesses are?
A.    No, sir.
Q.    Sir, were you present in the parking lot outside of the courthouse last week?
A.    No, sir.
Q.    After court?
A.    No, sir.
Q.    You didn't have anything to do with the assaulting, punching one of the witnesses in this case?

20

Trial Tr., dated 9/19/05, at 116. In rejecting petitioner's claim that counsel was ineffective for failing to object to this questioning, the Michigan Court of Appeals concluded that the questioning was not improper. The court noted that there was evidence that Mahdi had been threatened and that petitioner attempted to have friends or family members influence witness testimony. *See Nixon*, 2007 WL 624704, at *3. Petitioner cannot show that this questioning deprived him of a fair trial. As the court of appeals noted, there was some evidence that petitioner attempted, through friends and family, to influence witnesses, and that one witness had changed his story. Thus, there was some basis for the prosecutor's question. In any event, the questioning played no significant role in the trial. The questioning was brief in the context of the trial, Hill denied that he had threatened or assaulted any witness, and the prosecutor never again returned to the theme, either in questioning of Hill or other witnesses, or in closing arguments. In these circumstances, petitioner cannot show that he was denied a fair trial by the prosecutor's questioning of Hill.

Petitioner also contends that he was denied a fair trial when the prosecutor "misstated the testimony of Stanley January and transmuted that testimony into a confession" because January "could not say he actually heard a confession, but the prosecutor told the jury he had." Pet., at 9. This claim is without merit. January testified that he recalled the conversation with petitioner, but could not remember it word-for-word. *See* Trial Tr., dated 9/19/05, at 19. When asked by the prosecutor if petitioner "confessed" to January that he committed the crime, January responded that petitioner "spoke about it." *Id*. at 21. When another inmate asked petitioner if he committed the crime, petitioner "looked real nervous." *Id*. at 22. Petitioner told January that he thought "Naomi" was at home, but did not think any children were in the house. *See id*. at 24. Petitioner did not mention the father of Naomi's children (Rico), but when another inmate indicated that he knew the

21

father petitioner again became nervous. *See id*. at 25. When January asked him how he had done it, petitioner "said something about a cocktail," and said the house belonged to Naomi. *See id*. at 26.

During closing argument, the prosecutor began his discussion of January's testimony by addressing some of the credibility issues regarding January. The prosecutor then played for the jury the phone call that petitioner placed on January's behalf which, the prosecutor argued, corroborated some of January's testimony and showed that petitioner trusted January to some extent. Regarding the substance of January's testimony, the prosecutor continued:

> Mr. January's testimony is corroborated by indisputable physical evidence, and it makes sense, when you listen to it, compared to what Brandon Vaughn says.
> Also, ladies and gentlemen, Mr. January, if he wanted, if he wanted to make this up, and somehow he knew all of this information about what this – how this crime occurred, do you think he probably could have gone into more detail than he did in his testimony and his statement. He only said a few things he remembered Mr. Nixon saying. "Naomi's house, somebody named Rico was one of the fathers, a cocktail, didn't think the kids were home, sorry about killing kids because he just had a kid himself." Those five facts, ladies and gentlemen, every one of those facts is proven to you by another witness in this case, and some of those witnesses are the Defense's witnesses.
> The point is no matter how you shake it, no matter how you look at Mr. January, he's telling you what was told to him, and that is evidence that you can use by itself to convict beyond a reasonable doubt.

*Id*. at 170-71. After playing for the jury another phone call that corroborated January's testimony that petitioner was moved after he got scared that somebody recognized him, the prosecutor argued that this further supported January's testimony:

> The point is that Mr. January comes in the court and tells you Mr. Nixon got moved, and then we can prove that Mr. Nixon got moved. More corroborative evidence of what Mr. January tells you today. When you take his testimony along with Brandon Vaughn's and an absolutely weak and pathetic defense that's offered to you, the elements have been shown, and the verdict is appropriate for guilty as charged.

*Id*. at 171-72.

Contrary to petitioner's argument, nothing in the prosecutor's closing statement mischaracterized January's testimony. January did not come out and explicitly state that petitioner "confessed" to him, but neither did the prosecutor characterize January's testimony in that manner. Notably absent from the prosecutor's discussion of January's testimony is even a single instance of the words "confessed" or "confession." Rather, the prosecutor argued that petitioner made statements to January which showed petitioner's knowledge of the details of, and hence involvement in, the crime. This is precisely the import of January's testimony, and the prosecutor did no more than argue that (a) the facts of January's testimony were corroborated by other witnesses, and (b) those facts supported a finding that petitioner was guilty of the crimes charged. At no point did the prosecutor state that petitioner had confessed the crime to January, but only that it was a fair inference from the facts petitioner admitted to January that petitioner was involved in the crime. The prosecutor's comments were therefore proper. *See Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Ineffective Assistance of Counsel (Claims II & V)*

Petitioner next raises several claims that counsel was ineffective in various respects. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

23

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

24

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.  *Trial Counsel (Claim II)*

a.  *Failure to Investigate*

Petitioner first contends that counsel was ineffective for failing to investigate in a number of respects.  For example, petitioner contends that counsel was ineffective for failing to investigate

25

the results of the polygraph examination conducted by the police.  Petitioner contends that although the investigator officer told defense counsel that petitioner had failed the exam, the examiner told petitioner that he had passed.  Petitioner contends that counsel failed to pursue this information and contact the examiner.  However, petitioner cannot show how he was prejudiced by counsel's failure.  Michigan categorically excludes from evidence the results of polygraph examinations.  *See People v. Jones*, 468 Mich. 345, 355, 662 N.W.2d 376, 382 (2003); *People v. Kahley*, 277 Mich. App. 182, 183, 744 N.W.2d 194, 196 (2007).  This *per se* rule excluding polygraph results does not infringe petitioner's right to present a defense.  *See United States v. Scheffer*, 523 U.S. 303, 309-17 (1998).  Recognizing this rule, petitioner argues that he was prejudiced because counsel's "error prevented him from gaining the support he needed from witnesses and presenting character witnesses[.]"  Reply, at 5.  Even assuming that petitioner could establish prejudice in this manner,[4] he has failed to offer anything other than speculation in support of his claim here.  First, it is speculative that petitioner even passed the polygraph examination.  Petitioner contends that he was *told* that he

---

[4]In support of his argument, petitioner relies on the Michigan Supreme Court's explanation in *People v. Phillips*, 469 Mich. 390, 666 N.W.2d 657 (2003) (per curiam), in which the court explained:

> If the results of a polygraph examination indicate that a defendant might not have committed the crime, a victim could reconsider her identification testimony.  For the same reason, a prosecutor could reconsider the decision to prosecute or offer a plea bargain.  On the other hand, a defendant might use the results to convince character witnesses to testify on his behalf.  Even if convicted, favorable polygraph results may help a defendant reconcile with his family or friends.

*Id.* at 395 n.3, 666 N.W.2d at 660 n.3.  *Phillips* is inapposite.  In that case, the court was considering an issue of statutory construction regarding MICH. COMP. LAWS § 776.21(5), which grants a defendant in a criminal sexual conduct case a statutory right to a polygraph.  The portion of the court's opinion quoted above was merely the Supreme Court's speculation about the legislature's "reasons for drafting this provision in the manner in which it did." *Phillips*, 469 Mich. at 395 n.3, 666 N.W.2d at 660 n.3.  Nothing in the Michigan Supreme Court's decision or reasoning suggests that an attorney's failure to investigate polygraph results can cause prejudice by making it more difficult for a defendant to secure character witnesses.  Petitioner has cited, and I have found, no case from any court holding that a counsel's failure to investigate the results of a polygraph can cause prejudice in the manner suggested by petitioner.

26

passed by the examiner, but he has not presented an affidavit from the examiner, a copy of the polygraph report, or any other evidence showing that he in fact passed the police-conducted polygraph examination. The only evidence he relies on is the report that he passed a different polygraph examination during the post-conviction proceedings. These results, however, provide at most only minimal support for the contention that he passed an examination conducted by a different examiner years earlier. Further, petitioner's argument that favorable results on the polygraph may have made it possible for him to secure character or other witnesses is wholly speculative. Petitioner does not identify a single such witness who would have testified on his behalf if only he had known that petitioner passed a polygraph, much less does he provide any evidence regarding the substance of these speculative witnesses' testimony. Thus, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that counsel was ineffective for failing to interview prosecution witness Mario Mahdi, petitioner's cousin, who despite being called by the prosecution actually testified favorably to petitioner. Petitioner contends that counsel's preparation with respect to Mahdi "was limited to a brief interview in [the] hallway of court just before court was to resume." Br. in Supp. of Pet., at 23. Again, however, petitioner has failed to identify any prejudice arising from counsel's allegedly inadequate preparation. Mahdi recanted his earlier statements to the police and testified favorably to petitioner at trial, supporting petitioner's alibi. Petitioner does not identify any additional, favorable evidence that counsel should have elicited from Mahdi.

Petitioner further contends that counsel failed to sufficiently interview his alibi witnesses. At trial, in addition to his alibi witnesses petitioner presented the testimony of a neighbor, who claimed that he was sitting on his porch until 12:00 or 12:30 on the night in question and did not see

27

petitioner leave the house.  During closing argument, the prosecutor argued that despite this testimony, petitioner could have left his home through the back door, which the neighbor would not have seen.  Petitioner contends that had counsel properly interviewed his alibi witnesses, he could have elicited testimony that the back door was broken and had been secured shut.  Again, however, petitioner has presented no evidence to support this assertion.  He presents no affidavit from an alibi witness attesting to this fact, and indeed does not even include such an averment in his own affidavit.  A statement about the condition of the door in counsel's brief does not constitute evidence that any witness could or would have testified as petitioner contends.  Because it is petitioner's burden to establish the elements of his ineffective assistance claim, *see Pierce*, 63 F.3d at 833, petitioner is not entitled to habeas relief on his failure to investigate claims.

### b. Improper Advice

Petitioner next contends that counsel was ineffective for providing improper advice in a number of respects.  First, petitioner contends that counsel improperly failed to seek a separate trial from codefendant LaToya Caulfield, advising petitioner that he would benefit from hearing some of the evidence introduced against Caulfield.  Petitioner contends that Caulfield would have been his primary alibi witness, and that "[b]y failing to seek separate trials, Petitioner's best alibi witness was not available to testify on Petitioner's behalf."  Br. in Supp. of Pet., at 24.  Petitioner cannot establish that he was prejudiced or that counsel was deficient, for several reasons.  First, petitioner cannot show a reasonable probability that a motion to sever would have been granted.  Under Michigan law, "the decision to sever or join defendants lies within the discretion of the trial court." *People v. Hana*, 447 Mich. 325, 346, 524 N.W.2d 682, 690 (1994).  There is no right to a separate trial, and "a strong policy favors joint trials in the interests of justice, judicial economy, and

28

administration." *People v. Harris*, 201 Mich. App. 147, 152, 505 N.W.2d 889, 892 (1993). A trial court is required to grant separate trials only where a defendant, through affidavit or offer of proof, demonstrates "clearly, affirmatively, and fully . . . that his substantial rights will be prejudiced" in the absence of severance. *Hana*, 447 Mich. at 346, 524 N.W.2d at 690. Petitioner has not made such a showing. Second, petitioner did, in effect, have a separate trial. Although he and Caulfield were tried jointly, they were tried before separate juries, precisely so that evidence admissible against only one of them would not be heard by the other's jury. Petitioner fails to explain why he could not call Caulfield under this arrangement, any less than if the trials had been completely separate. Third, petitioner cannot show that Caulfield would have testified in separate trials. Even in cases on direct review, a defendant seeking relief on the type of claim raised by petitioner must show that his codefendant in fact would have waived any Fifth Amendment privilege and actually testified at trial. *See Ross v. United States*, 339 F.3d 483, 493-94 (6th Cir. 2003). Here, although Caulfield's affidavit describes what she would testify to now, she does not aver that she was willing to waive her privilege against self-incrimination at the time of trial. *See* Br. in Supp. of Pet., Exs. 8 & 9. Finally, petitioner cannot show that, had Caulfield been willing to testify and been called by counsel, there is a reasonable probability that the result of his proceeding would have been different. Petitioner presented several alibi witnesses, each of whose testimony the jury rejected. Caulfield's additional alibi testimony would have been self-serving, as it served to exonerate both her and petitioner. This is not a case in which petitioner's co-defendant would have implicated herself while exonerating petitioner. There is no reasonable probability that the jury would have accepted Caulfield's testimony while rejecting petitioner's other alibi testimony. Thus, petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that counsel failed to advise him about his right to testify. Specifically, petitioner avers:

> At no time before or during my trial did my lawyer ever discuss with me whether or not I would testify in my own defense. He never explained anything about that topic, i.e., my rights to testify or to remain silent; what it would mean to me, my case and the jury if I testified, or if I did not testify. He did not tell how I would be questioned in court by him, and then cross examined by the prosecutor; etc., etc., etc.

Br. in Supp. of Pet., Ex. 7, ¶ 17. This claim fails, for several reasons. First, at no point during the trial, particularly when counsel indicated that the defense rested, did petitioner indicate that he wished to testify or otherwise object to counsel's decision not to call him. In light of the presumption that trial counsel followed the professional rules of conduct, petitioner's silence weighs heavily against his claim. *See United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000); *United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993). Further, petitioner has presented no evidence, apart from his own self-serving affidavit, to support his claim that counsel did not inform him of his right to testify. *See Ashley v. United States*, 17 Fed. Appx. 306, 309, 2001 WL 966493, at *3 (6th Cir. Aug. 16, 2001). Likewise, petitioner has offered nothing to establish that he was prejudiced by counsel's alleged failure to advise him of his right to testify. Petitioner avers only that counsel failed to inform him of his rights. He does not aver that, had he been properly advised he would in fact have testified, much less does he aver what the purported testimony would have been or offer any reason to believe that there is a reasonable probability that the result of the proceeding would have been different had he testified. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Present Evidence

Petitioner next contends that counsel was ineffective for failing to present evidence to rebut

the prosecutor's theory that he and Simmons were fighting over the affections of Caulfield. Petitioner contends that his mother could have testified that he and Simmons had resolved their disagreement, and thus that the prosecutor's theory of petitioner's motive was wrong. The Court should conclude that petitioner is not entitled to habeas relief on this claim. Counsel's strategic decisions regarding what witnesses to call at trial are "virtually unchallengeable." *Awkal v. Mitchell*, 613 F.3d 629, 641 (6th Cir. 2010). The Court's "concern is not to decide, using hindsight, what [it] think[s] would have been the *best* approach at trial. Instead, [the Court] consider[s] only if the approach ultimately taken was within 'the wide range of reasonable professional assistance' given the circumstances." *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689). Here, petitioner cannot show that counsel's decision to refuse to call petitioner's mother was unreasonable, or that he was prejudiced by the absence of this testimony. On the contrary, it is likely that the testimony of petitioner's mother would have hurt rather than helped petitioner's case.

As petitioner's mother, Tracy Nixon, indicates in her affidavit, petitioner told her in January 2005 that he suspected Simmons and Caulfield were having an affair. When he later learned that they were in fact having an affair, petitioner was "devastated," he and Simmons "became bitter enemies," and "[e]ach threatened physical harm to the other." Br. in Supp. of Pet, Ex. 11, ¶ 8. On a regular basis she would hear from family or friends "about the latest episode in Kenneth and Ronrico's 'beef.'" *Id*., ¶ 9. This testimony would have bolstered the prosecutor's theory that petitioner had a motive for the crime against Simmons. Contrary to petitioner's argument, the affidavit of his mother does not establish that petitioner and Simmons "had reconciled their differences and were on friendly terms at the time of the fire." Reply, at 7. Rather, petitioner's

31

mother avers that she overheard petitioner's side of a telephone conversation in which petitioner said: "We are going to stop this beefing right now. You stay away from me, I'll stay away from you." Br. in Supp. of Pet., Ex. 11, ¶ 14. Even assuming that Tracy Nixon's hearsay account of this conversation would have been admissible, petitioner's statements do not indicate a reconciliation or that he and Simmons were on friendly terms. At best petitioner's statements indicate a cease-fire, one to which Simmons' response is unknown. Nothing in Tracy Nixon's affidavit establishes that petitioner and Simmons had reconciled or calls into question the prosecutor's motive theory, and indeed much of the affidavit supports the prosecutor's motive theory. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Failure to Object

Petitioner next contends that counsel was ineffective for failing to object to: (1) the prosecutor "transmuting" January's testimony into a confession made by petitioner; (2) the prosecutor's questioning of Hill suggesting that Hill had tampered with a witness; and (3) hearsay statements of Brandon Vaughn admitted through the testimony of other witnesses. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

It is well established that counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Here, any objection by counsel on the bases suggested by petitioner would have been meritless. As explained above, the prosecutor did not "transmute" January's testimony; rather, the prosecutor properly argued on the basis of January's testimony, and did not misrepresent that testimony in any way. As also explained above, the prosecutor's questioning of Hill was not improper. With respect to the

hearsay statements of Brandon Vaughn, the Michigan Court of Appeals concluded that the testimony was admissible as a matter of state law. Specifically, the court concluded that Vaughn's statements to other witnesses were not hearsay under Rule 801(d)(1)(C) because they were statements of identification, and in any event were admissible as excited utterances under Rule 803(2). *See Nixon*, 2007 WL 624704, at *2-*3. It is well-established that "[a] determination of state law by a state appellate court is . . . binding in a federal habeas action." *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007); *see also*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000) ("Principles of comity and finality equally command that a habeas court can not revisit a state court's interpretation of state law."). Thus, in analyzing petitioner's ineffective assistance claim, the Michigan Court of Appeals's conclusion that the evidence was properly admitted is binding on this Court. *See Narlock v. Hofbauer*, 118 Fed. Appx. 34, 34 (6th Cir. 2004) (per curiam); *Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). Because the evidence was properly admitted under state law, petitioner cannot be deemed ineffective for failing to object. Accordingly, petitioner is not entitled to habeas relief on this claim.

3.    *Appellate Counsel (Claim V)*

Petitioner also contends that his appellate counsel was ineffective for failing to raise on direct appeal the claims that petitioner raised in his state court motion for relief from judgment. In the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*,

33

75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, each of petitioner's underlying claims is without merit, and thus petitioner cannot show that he was prejudiced by counsel's failure to raise them on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Recommendation Regarding Certificate of Appealability*

   1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893

34

n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.   *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above. To the extent petitioner raises his newly discovered evidence and actual innocence claims as independent grounds for relief, it is not reasonably debatable that such claims are not cognizable on habeas review. With respect to petitioner's perjury claim, as explained above petitioner has failed to present any competent evidence that January committed perjury, and he has

35

failed to present any evidence whatsoever that the prosecutor knew of this alleged perjury. Thus, the resolution of this claim is not reasonably debatable. Further, because there was a good faith basis for the prosecutor's question to Hill regarding witness tampering, and because the question did not deprive petitioner of a fair trial in any event, the resolution of petitioner's prosecutorial misconduct claim is not reasonably debatable. Finally, for the reasons explained in detail above, the resolution of petitioner's various ineffective assistance of counsel claims is not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health*

*& Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 9/28/12

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and   by electronic means or U.S. Mail on September 28, 2012.

s/Eddrey Butts
Case Manager